

**RECEIVED** LJ
1/6/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

### THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| MARISSA GIRARD, | |
| Plaintiff, | 1:25-cv-00136 |
| | Judge Andrea R. Wood |
| | Magistrate Judge Maria Valdez |
| v. | Civil Action No. RANDOM/Cat. 2 _____ |
| | District Judge _____ |
| JUDGE ROSSANA P. FERNANDEZ, | |
| JUDGE REGINA A. SCANNICCHIO, | |
| JUDGE GREGORY E. AHERN, | **FILED** RC |
| ELENA S. DEMOS JD, | 1/13/2025 |
| VINCENT D. WALLER JD, | Complaint and Jury Demand |
| ADAM P. MONREAL ESQ, and | THOMAS G. BRUTON |
| EBONY CHEERS, | CLERK, U.S. DISTRICT COURT |
| Defendants. | |

Plaintiffs Marissa Girard, in pro se, for her Complaint against Defendants **hereby requests a trial by jury** pursuant to FRCP 38(b) and alleges as follows:

### BACKGROUND STATEMENT

1.      On or around Fall 2022, Jane F. Girard – a proven sex abuser of her children – commenced an inexplicable quest to strip custody of her twin biological daughters from their father Kenton Girard under Cook County Case No. 2015D9633 ("Custody Proceedings"). Plaintiff's only connection to that matter devolves from the fact that she is Kenton Girard's wife.

2.      Customarily, such proceedings do not implead successive spouses or non-parents as parties, however here attorneys Mirabelli and Paige and Meyers (herein, "Jane Legal Team") vexatiously named Plaintiff as a third party respondent under the Custody Proceedings in order to gain leverage over Kenton Girard by illicitly imposing stress, trauma, anxiety, distress, inconvenience and significant cost and expense on Plaintiff.

3.      The vexatious naming of Plaintiff as a third party respondent under the Custody Proceedings is a grave concern given her extremely serious mental and physical disabilities at play. To wit, Plaintiff suffers from interstitial cystitis, a debilitating condition that can render her unable to leave home in part due to the constant need to urinate, particularly when exacerbated by stress or when the condition expresses in the format of intense and incapacitating vaginal pain. She also suffers from PTSD, which is aggravated by environmental stress and anxiety and in turn worsens her physical symptoms under interstitial cystitis.

4.      The Jane Legal Team has launched an all-out offensive on Plaintiff using the court system, involving excessive and sham motions and papers. The abuse of the judicial proceeding to harass Plaintiff has included *inter alia* seeking judicial sanctions and jail time against Plaintiff for her apparent failure to enforce a gag order on Kenton Girard's daughters, making a mockery of her medically documented disabilities which require accommodation under the Americans with Disabilities Act of 1990 ("ADA"), playing cat-and-mouse over the scheduling and the format of her in-person deposition – devoid of any intended probative value for crafting a custody order as to Kenton and Jane's children, the making of off-channel threats against her well-being and her livelihood, and most recently goading Judges Rossana P. Fernandez and Gregory E. Ahern to trample her rights arising under the Constitution and the ADA.

5.      The Jane Legal Team apparently has a very friendly audience in the family courts of Cook County, wherein Plaintiff has been the victim of a frivolous, abusive and vexatious circus of legal proceedings presided by a revolving door of eight different judicial officers, most recently Judges Rossana P. Fernandez[1] and Gregory Ahern. Meanwhile, the Presiding Judge of

---

[1] Judge Rossana P. Fernandez has recused herself pending the adjudication of a Substitution of Judge for Cause, brought against her by Kenton Girard under the authority of 735 ILCS 5/2-1001(a)(3). Two previous judges, William S. Boyd and Renee G. Goldfarb, resigned under suspicion of extrajudicial wrongdoing including bribery.

*Marissa Girard v. Rossana P. Fernandez et al.*

the Domestic Relations Division Regina A. Scannicchio – ostensibly occupying a supervisory posture as to all family court proceedings in Cook County and the only judicial officer who has continuously overseen the Custody Proceedings from the beginning – has turned a blind eye to the corrupted and unconscionably improper proceedings. Judge Scannicchio's lieutenant Adam P. Monreal Esq moreover has passively watched from the sidelines – refusing to answer innumerable email messages and telephone calls – as Plaintiff's rights have been eviscerated.

6.      There is notably pending litigation[2] in this District ("Bribery Lawsuit") which explores accusations of bribery against various judicial officers – including Defendant Scannicchio, who is described as "owned by Beermann LLP" – connected with the Custody Proceedings. That Bribery Lawsuit also seeks relief *inter alia* from civil RICO violations by Jane F. Girard's counsel Enrico Mirabelli and his law firm Beermann LLP.

7.      The reprobate cast of characters responsible for Plaintiff's mistreatment under the Custody Proceedings also includes a Cook County lifer who has previously been the target of criminal investigation, namely Judge Scannicchios's Chief Deputy Clerk Adam P. Monreal Esq., who has administrative duties over the entire Domestic Relations Division of Cook County.

8.      Mr. Monreal was forced to resign from the Illinois Prisoner Review Board in 2016 after former Governor Bruce Rauner discovered that he had under-reported his state salary in a bankruptcy proceeding which was closed in August 2011. At that time, Monreal was chairman of the state parole board, appointed to that position by former Governor Pat Quinn in 2010.

9.      In addition to Defendant Monreal, Judge Scannicchio relies on a number of wildly compromised judicial officers in Domestic Relations when a case is moved to Calendar 01

---

[2] See *Kenton Girard v. Village of Glencoe et al.*, Civil Action No. 1:24-cv-06882, N. Dist. Illinois. The operative pleading is filed under Dkt[73] in that proceeding.

pursuant to a petition for substitution of judge, following an order of recusation or other circumstances wherein there is a prospect of having to change the judicial officer.

10.    One of these compromised judges is Defendant Gregory E. Ahern Jr, who has recently presided over the Custody Proceedings. Despite his Cook County salary of $260,000 resides in a palatial six-bed six-bath 6,000 square foot home in the most expensive zip code in Illinois at 465 Sunset Road in Winnetka. That residence is currently worth ~$3.5 million (per Zillow) and incurs an annual property tax bill of ~$45,000.

11.    Prior to living in Winnetka, Defendant Ahern resided at 1815 N. Honore Street in Chicago, which residence he purchased for $440,000 in 2002. Once he was appointed by the Supreme Court of Illinois to fill a vacancy as an Associate Judge on January 3 2013, Defendant Ahern's financial picture dramatically improved wherein upon information and belief he cut a backroom deal with Beermann LLP. The deal was consummated in a meeting with attorney John M. D'Arco during an in-person meeting at the LaGrange Country Club located at 620 S Brainard Ave, La Grange, IL 60525 during the summer of 2014. Under the deal, Judge Ahern agreed to accept a regular flow of cash bribes to render favorable decisions for the clients of Beermann LLP in the proceedings he presided over. Upon information and belief, he makes in excess of $25,000 per month in undeclared bribery income[3] from Beermann LLP.

12.    On September 15 2017, Defendant Ahern closed on his purchase of 465 Sunset Road in Winnetka (PIN # 05-21-409-010-0000) with the deed[4] being recorded five days later and reflecting a purchase price of $2,165,000. To finance that purchase, Defendant Ahern got a loan for $1,515,418 with an interest rate of approximately 3.9% and he tendered $650,000 in cash to

---

[3] Upon information and belief, Defendant Ahern is moreover a "gateway judge" – like Judge William S. Boyd – who is trusted to direct funds to bribe other judges within the Domestic Relations Division. See the amended pleading at Dkt[73] at ¶¶ 37, 38, 40, 89 under the Bribery Lawsuit.

[4] The ownership interest in the home is shared equally by the Gregory E. Ahern Jr. Trust Dated March 23 2011 and the Lisa Nolan Ahern Trust Dated March 23 2011.

close[5]. Monthly principal and interest alone are ~ $7,200 per month. Homeowner's insurance for a replacement value of $2,165,000 would likely be ~$12,000 per year based on data from State Farm. Adding in the annual tax bill of ~$45,000 brings the monthly obligation to ~ $12,000.

13.     Utilities (water, gas, electricity, trash, internet) probably imply about $1,200 of additional monthly costs. Upkeep and maintenance is usually estimated at $6.00 per square foot per year. In this case another $36,000 per year. Therefore the monthly payment obligations on the home elevate to ~$16,000. Add in the looming college expenses for Ahern's children and the staggering monthly costs cast a long shadow over Ahern's $260,000 salary from Cook County.

14.     Recently, Defendant Ahern was taken off the bench by the Supreme Court of Illinois, **for exhibiting unacceptable racist bias** in postings on social media. On September 12 2023, the Executive Committee of the Circuit Court of Cook County vacated a previous order restricting Judge Gregory E. Ahern Jr.'s duties. Judge Ahern had been assigned to restricted duties in the office of the Presiding Judge of the First Municipal District under Special Order 2023-121, dated August 25, 2023.

15.     The original order was issued after it was reported on August 15 2023 that Judge Ahern had used social media to express support for comments that could reasonably be interpreted as suggesting bias or prejudice based on race, gender, gender identity, or sexual orientation. Such expressions were seen to potentially undermine his judicial independence, integrity, or impartiality.

16.     It is deeply ironic that Judge Ahern – **the only judicial officer in the current Domestic Relations roster to have been suspended for misconduct out of several dozen judicial officers** – has been hand-picked by Judge Scannicchio to preside over the Custody

---

[5] Upon information and belief, Defendant Ahern saved significantly from his undeclared bribery income from Beermann LLP during 2013-2017, which allowed him to save up $650,000 for the down payment on his Winnetka mansion. Notably, he did not have any proceeds from the sale of his previous residence at 1815 N. Honore Street in Chicago because that property did not sell until approximately one year after he purchased the Winnetka mansion.

Proceedings in the wake of Judge Fernandez's recusal for exhibiting unacceptable bias and inexplicable antagonism against court watchers and Plaintiff.

17.     However, the Judicial Inquiry Board informed the court on September 11 2023 that it had concluded its investigation into the allegations against Judge Ahern. The Board reported that no further action was warranted and the matters were now closed.

18.     As a result, the Executive Committee issued Special Order 2023-126 on September 12 2023. This order vacated the previous restrictions and reassigned Judge Ahern to the Domestic Relations Division, effectively returning him to his regular judicial duties.

19.     Upon information and belief, attorney John M. D'Arco from Beermann LLP was instrumental in obtaining the reprieve from the Supreme Court of Illinois for Judge Ahern, wherein he relied on his federal felon father's deep relationship with federal felon Ed Burke[6] to obtain the favor from the Supreme Court of Illinois. Indeed, Ed Burke's wife Anne M. Burke served as a justice of the Supreme Court of Illinois until she resigned from that position on November 30 2022. Ironically after the latest intervention by John M. D'Arco, Defendant Ahern is now even more beholden to Beermann LLP and Plaintiff is hostage to these fixed proceedings.

## JURISDICTION AND VENUE

20.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law. This Court also has jurisdiction under 28 U.S.C. §1343(a)(3) to redress deprivations "under color of any state law, statute,

---

[6] As is explored in much more detail in the Bribery Lawsuit, pending before District Judge Pallmeyer, John M. D'Arco's father John A. D'Arco Jr (also a former member of the Illinois Bar) represented the interests of the Chicago Outfit in his position as state senator wherein he exercised significant influence over state matters until he was convicted under consecutive indictments for bribery in the Northern District of Illinois and in addition to being remanded to prison was ordered to never again work in the employ of any state in our country in any capacity whatsoever. It is well known, furthermore, that beyond his wife being a Supreme Court justice in our state, Ed Burke's corrupt hand was deeply involved in the emplacement for appointment of many judges in Cook County over the years in what can only be described as a long history of extremely transparent and ostentatious pay-to-play schemes. In true Chicago tradition, Ed Burke capped his long political career with a criminal conviction in this district for *inter alia* racketeering and extortion.

ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States."

21.     The Court has authority to grant injunctive relief pursuant to 42 U.S.C. § 1983 and the Court's inherent equitable powers.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants work and reside in this district. Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district.

23.     Venue is further proper in this district as to those claims which do not specifically raise federal and constitutional questions under 28 U.S.C. §1367(a).

24.     This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## PARTIES

25.     **Plaintiff Marissa Girard** is a longtime resident of Glencoe  and the wife of Kenton Girard, whose ex-wife Jane F. Girard initiated the Custody Proceeding.

26.     **Defendant Rossana P. Fernandez** is a circuit judge in the Domestic Relations Division who has recently presided over the Custody Proceeding. She is being sued in her personal capacity.

27.     **Defendant Regina A. Scannicchio** is the presiding judge over the Domestic Relations Division of Cook County. She is being sued in her personal capacity.

28.     **Defendant Gregory E. Ahern** is an associate judge in the Domestic Relations Division who has recently presided over the Custody Proceedings. He is being sued in his personal capacity.

29.     **Defendant Elena S. Demos JD** is the Cook County Court ADA coordinator, wherein she reports to the Office of the Chief Judge Timothy Evans.

30.     **Defendant Vincent D. Waller JD** is an HR coordinator for the Cook County Court.

31.     **Defendant Adam P. Monreal Esq** is the Deputy Chief Clerk for Presiding Judge Scannicchio.

32.     **Defendant Ebony Cheers** is the courtroom coordinator for Judge Fernandez.

The bench in Domestic Relations is full of compromised judicial officers.

33.     The stench is not limited to Judges Fernandez, Scannicchio and Ahern.  An instructive example is Associate Judge Myron F. Mackoff, the son of retired Cook County Circuit Judge Benjamin Mackoff and who was appointed to the bench after having previously lost in a primary election. He was facing financial ruin in 2013-2014 wherein the landlord filed an eviction proceeding against his law firm and he was sued for foreclosure, which lawsuit he litigated for three years. Then Myron relied on his father's political clout to get appointed to the bench, with the aim of getting his hands on the accompanying $260,000 salary which would shore up his disastrous personal finances. Myron – like many other associate judges – was appointed to the bench after filling a temporary vacancy and then losing in the primary election.

34.     Associate Judge Lori Rosen was a longtime Cook County prosecutor and upon information and belief a long-time romantic interest of Judge Gregory Ahern, during the period of time in which he has been married to his wife Lisa Nolan Ahern. Upon information and belief, Judge Ahern used his political clout to get Ms. Rosen appointed to the bench in 2018 – a few years after his own appointment.

35.     Judge David E. Haracz is an associate judge of the Domestic Relations Division of the Circuit Court of Cook County. He was elected to the bench in 2005 and re-appointed in 2011, 2015, and 2019. His tenure is beset with allegations that he has a long record of wreaking tremendous destruction and damage on families and children due to his relentless illegal orders that transfer family funds to his acquaintances and prolong cases so as to enrich court appointed child representatives and attorneys.

36.     Judge Michael Forti is known for incarcerating Steve Fanady in his divorce from Pamela Harnack *for going on three years*. In that matter, Beermann LLP attorney John M. D'Arco's former law firm Lake Toback represents Ms. Harnack.

37.     As recently as 2011, the Chicago Tribune reported the surest way to land an appointment to the bench in Cook County was to be recommended to former alderman Ed Burke by Michael Madigan (Speaker of the Illinois House from 1983 to 2021, with the exception of 1995–1997 when Republicans took control of the Illinois House). Ed Burke headed the Cook County Democratic committee tasked with picking judicial candidates for decades. And the Chicago Tribune further noted that one of the surest ways to receive a nod from Madigan was to donate to the campaign of his daughter, former Illinois Attorney General Lisa Madigan.

38.     From 2012-2018, campaign finance records show that Michael Forti, who had gone on to work as chief counsel for the Illinois Department of Transportation, donated thousands to campaign funds run by Ed Burke and other powerful Chicago Democrats.

39.     Other Domestic Relations judges recommended by Michael Madigan to Ed Burke include Judge James A. Shapiro, Judge Matthew Link, Judge Edward Arce and Presiding Judge Regina Scannicchio. All of these judges were delivered to their positions courtesy of Ed Burke and are moreover completely compromised.

40.     Judge Michael Forti is not the only Domestic Relations judge to have come under scrutiny implementing debtor's prisons under findings of indirect civil contempt of court, for failing to pay often millions of dollars of "domestic support obligations," typically consisting largely of attorney fees racked up by the other spouse.

41.     In nearly all instances, the incarcerations in Cook County Jail have come despite repeated assertions by the men that they do not have the money the courts believe they have, and despite pleas from the men that the jailing jeopardizes their ability to earn money to pay the support the court has ordered them to pay.

42.     One such example is Judge Abbey Romanek, who famously sent River Forest real estate developer Frank "Marty" Paris to debtor's prison on three separate occasions during the divorce proceedings with his wife. Journalists from near and far decried Judge Romanek's embarrassing inability to achieve even a basic understanding of the balance sheet of a corporation and confusing its assets for the disposable income of Mr. Paris.

43.     In *IRMO Roseanne Tellez and David A. Cerda*, 2024 IL App (1st) 241866, the Illinois Appellate Court ruled on December 20 2024 that Judge Scannicchio abused her discretion by jailing David A. Cerda for civil contempt with a cash bail set at $248,648.73. In that matter, Judge Scannicchio – who is, *frighteningly*, the current presiding judge of the Domestic Relations Division of Cook County – recklessly disregarded the requirement to assure that a civil contemnor has the ability to pay the purge remedy. Mr. Cerda nonetheless was illegally jailed for three months all the same.

44.     On May 24 2024, Dr Kimberly Lopez was facing jail for indirect civil contempt in the courtroom of Judge Bernadette Barrett in her family law case 2011D579053 in the Fifth

Municipal District in Bridgeview. Similar to the rebuke against Judge Regina Scannicchio, the Illinois Appellate Court overruled Judge Bernadette Barrett.

45.     Given the enormous critical mass of corrupted judicial officers in Domestic Relations, it is wholly unsurprising that the courts and their agents are also routinely weaponized against whistleblowers. In 2021, deceased attorney Edwin "Ted" Bush III famously came under disciplinary proceedings from the ARDC amid his encounter with Cook County's family courts, accusing judges and guardians ad litem of misconduct over their handling of the dispute between him and his ex-wife over custody of their three children.

46.     Bush notably compared the conduct of the judges, lawyers and GALs involved in divorce proceedings to child trafficking: "Domestic relations courts and their surrounding cottage industries are predatory and resemble organized crime—seizing children from fit parents and then selling them back with unnecessary and unwanted 'services,'" Bush wrote. "That is none other than child trafficking."

47.     Unfortunately, pancreatic cancer took the life of Mr. Bush in his mid-40s and he did not get the opportunity to vindicate his good name which was tarnished by the corrupt instrumentality of the ARDC as puppeteered by the family law community of Cook County. However, his efforts to expose the systemic corruption in the Domestic Relations Division have scored a profound impact on the court reform community in Cook County and beyond, including under the landmark ruling under *J.B. v. Woodard*, 997 F.3d 714, 722 (7th Cir. 2021).

48.     Domestic Relations Judge Ellen L. Flannigan is a piece of work. In a family law proceeding *IRMO Szymulanski*, Cook County Case No. 2021D008999, Judge Flannigan allowed Beermann LLP to propound a dozen separate excessive and abusive motions for fees totalling in

excess of $600,000 and allowed Beermann LLP to gin up criminal charges against Mr. Szymulanski to see him arrested and the charges subsequently dropped for lack of evidence.

49.     The Robing Room reviews of Cook County Domestic Relations Judge Ellen L. Flannigan are very typical for the Domestic Relations judges. Those reviews complain that "[her] prejudices are so obvious it only emboldens the side she favors to ask for more and be less likely to compromise. She cares not about equal protection, precedent or due process. When she takes a side she advocates for that side… [harbors] bias against fathers, minorities … calls good people 'gangbangers', indiscriminately drug tests minorities, and breaks families up."

50.     It is therefore no surprise that the Cook County court system routinely ranks low among the various venues across our land. Domestic Relations is reputed as a judicial hellhole.

The Custody Proceedings have exacted a heavy toll on Plaintiff.

51.     The unreasonably lengthy nature of the Custody Proceedings – now going on three years – has caused an outrageous imposition on Plaintiff's life and work. Plaintiff has had to turn away numerous clientele from her therapy and consulting practice, due to being overwhelmed by time commitments to attend to the Custody Proceedings and to attend to her aggravated physical conditions owing to the stress caused thereby, wherein Plaintiff has already been suffering from interstitial cystitis and PTSD (both of which are qualifying disabilities under the ADA) and those conditions have become more acute and debilitating as the Jane Legal Team refuses to relent from its sanctionable and illegal onslaught of court filings.

52.     Most recently, on October 16 2024 Plaintiff exercised her statutory right to call for removal of the presiding judicial officer du jour, namely Defendant Fernandez. She duly and properly filed her motion, at which point under the plain language of 735 ILCS 5/2-1001(a)(2) Defendant Fernandez was by operation of the statute removed from the Custody Proceedings.

53.     In open court at a court date in the Custody Proceedings on October 18 2024, attending to the first order of business, **Judge Fernandez granted Plaintiff's petition**. However, with the goading of the Jane Legal Team, Defendant Fernandez subsequently defiantly changed her ruling from "granted" to "stricken" and proceeded to issue numerous orders and directives under a full-blown Case Management Conference on October 18 2024. Doubling down, she issued further orders during a court date on December 6 2024, before recusing herself from the proceedings on December 9 2024.

54.     By commanding the bench when Defendant Fernandez had been operatively removed – **indeed she had divested herself of jurisdiction by pronouncement in open court** – from the Custody Proceedings, Defendant Fernandez has made herself amenable to suit.

<u>The Defendants have desecrated the First Amendment rights of Plaintiff.</u>

55.     The October 18 2024 court date was not a closed proceeding, it was attended by numerous litigants and attorneys with different matters before the Court – none of which were closed to the public.

56.     Plaintiff, as named third party respondent under the Custody Proceedings, presided jointly by Defendants Fernandez and Ahern, was set to attend the October 18 2024 court date to present her petition for substitution of judge as of right directed at Judge Fernandez.

57.     Plaintiff was to appear via Zoom, as were a number of litigants, attorneys, and other observers. However, Plaintiff was never allowed access to the courtroom proceeding from the Zoom "waiting room". Judge Fernandez and Ahern's courtroom coordinator Ebony Cheers personally controlled the Zoom "waiting room" wherein she refused to admit Plaintiff to the proceedings at the behest of Judges Fernandez and Ahern.

58.     When the matter was called, Judges Fernandez and Ahern refused to allow

courtroom coordinator Ebony Cheers to admit Plaintiff from the Zoom "waiting room". Plaintiff was not permitted to present her petition or to otherwise participate or observe in the court date on October 18 2024. Moreover, at no point in time did the Court indicate that the proceedings were closed to the public. Instead, Judges Fernandez and Ahern capriciously and inexplicably decided that Plaintiff had no business in her court and refused to admit her.

59.     The Defendants failed to ensure that the Circuit Court of Cook County, Illinois was accessible to Plaintiff because *inter alia* it failed to ensure that Plaintiff was admitted to the October 18 2024 proceeding controlled by Judges Fernandez, Ahern and Scannicchio.

60.     Plaintiff has been injured as a result of the Defendants' conduct and has sustained humiliation and emotional distress, has suffered lost earnings under her private therapy and counseling practice, has suffered the indignity of discrimination, which has manifested in emotional distress, injury to her earning capacity, disrupted her personal life, and caused the loss of enjoyment of the ordinary pleasures of life.

61.     Absent action protecting the rights of free access to courtrooms for the public, the judicial system's credibility will be unnecessarily tarnished by the actions of the Defendants. As a result of Defendants' refusal to allow Zoom access to court to Plaintiff, she has been denied court access and court services provided to non-disabled persons and faces risks and burdens not experienced by non-disabled persons, including:

a. Fear of dire health consequences, and possibly death.

b. Having to rely on advocacy for her interests *outside of the courtroom* from which she has been excluded.

c. Increased anxiety, frustration, and embarrassment, having been denied a voice in the courtroom proceedings under which she is a named third party respondent.

<u>The protections of the ADA are relevant here.</u>

62.     Plaintiff is a member of a protected class under 42 U.S.C. § 12101, et seq. Plaintiff is also a "qualified individual with a disability" as defined in 29 U.S.C. § 794 for application of the Rehabilitation Act of 1973. The Rehabilitation Act and its implementing regulations require that no qualified individual, solely by reason of her actual or perceived disability, be subjected to discrimination under any program or activity receiving Federal financial assistance.

63.     The United States Department of Justice Civil Rights Division has recently provided "Guidance on Web Accessibility and the ADA." It states in part, "the Department has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."

64.     In today's tech-savvy world, Zoom is a widely used, reliable, scalable and proven technology for enabling remote court attendance over the Internet. The Zoom application may be utilized on mobile devices and home computer systems and is widely supported by various operating systems and protocols. As of April 2020, Zoom video conferencing software enjoyed use by an average of three hundred million (300,000,000) conference participants per day[7].

65.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Title II further prohibits the unnecessary segregation of persons with disabilities.  *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999).

66.     The chief purpose of the ADA is to end discrimination against, and the isolation of, individuals with disabilities.  As Congress stated in the findings and purpose section of the

---

[7] See market research about Zoom in which monthly usage statistics were reported.

ADA: "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2). Congress further found that discrimination against individuals with disabilities persisted in education and access to public services, and that such individuals faced various forms of discrimination, including "segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."  42 U.S.C. §§ 12101(a)(3), (a)(5).

67.     Title II of the ADA therefore prohibits discrimination on the basis of disability by public entities as codified under 42 U.S.C. § 12132.  A "public entity" is any State or local government and any department, agency, or other instrumentality of a State or local government, and covers all services, programs, and activities provided or made available by public entities, including through contractual, licensing, or other arrangements.  *Id*. §§ 12131(1), 12132; 28 C.F.R. § 35.130.  Accordingly, Title II's coverage extends to the State and its agencies.

68.     Congress directed the Attorney General to issue regulations implementing Title II of the ADA.  *See* 42 U.S.C. § 12134. The Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  "The most integrated setting" means a setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . "  Id. pt. 35, app. B at 690.

69.     Title II's regulations further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary segregation, or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public

entity's program with respect to individuals with disabilities . . . ." *Id.* § 35.130(b)(3).

70.    The Supreme Court has held that Title II prohibits the unjustified segregation of individuals with disabilities in the provision of public services. *See Olmstead*, 527 U.S. at 597. Unjustified isolation of persons with disabilities who, with reasonable modifications, could participate in an integrated setting is unlawful discrimination because (1) segregation "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and (2) segregation "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600-01.

71.    Title II's regulations also address discrimination in the form of inequality in services, programs, or activities provided by public entities. Public entities may not (1) "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service;" (2) "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from an aid, benefit or service that is not equal to that afforded others;" (3) "[p]rovide a qualified individual with a disability with an aid, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;" or (4) "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit or service." *Id.* § 35.130(b)(1)(i)-(iii), (vii).

72.    The ADA expressly contemplates the injunctive relief that Plaintiff seeks in this action. Further, Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 28 C.F.R. § 35.130(a).

73.    People who suffer from PTSD or interstitial cystitis - such as Plaintiff are qualified individuals with disabilities under the ADA as amended in 2008. Plaintiff is, and at all times relevant hereto has been, suffering from PTSD and interstitial cystitis, therefore, a member of a protected class under the ADA and the regulations implementing the ADA.

74.    Section 504 of the Rehabilitation Act of 1973 prohibits a "qualified individual with a disability," solely by reason of her or his disability, from being "denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

75.    The Cook County Court System is a recipient of federal funds. Furthermore, Zoom accommodation of Plaintiff would be in keeping with the trend of virtually all proceedings in Cook County wherein Zoom participation is allowed (and moreover encouraged).

76.    While the ADA does not require the court system to take any action that would fundamentally alter the nature of court programs, services, or activities, or that would impose an undue financial or administrative burden on the courts, Title II of the ADA does prohibit discrimination on the basis of disability in state and local government programs and services. Title II incorporates the remedies available under the analogous federal law, Section 504 of the Rehabilitation Act, which prohibits disability discrimination by federally funded programs.

77.    The Defendants have hereby discriminated against persons with disabilities under their manifest failure to comply with the ADA. Hereunder, Plaintiff was denied the ability to participate in court dates under the Custody Proceedings viz Zoom, wherein only Zoom offers a tried and tested and reliable manner of participating which does not threaten aggravation of her

pre-existing mental and physical conditions which have been fully diagnosed and documented by years of treatment under the care of her physician.

78.     Plaintiff has been excluded from participating and attending court dates in the Custody Proceedings via the actions and decisions of (a) Judges Fernandez and Ahern and Courtroom Coordinator Ebony Cheers, (b) the Court Disability Coordinator Elena Demos and Vincent D. Waller, and (c) through the Domestic Relations leadership under the supervision of Judge Scannicchio and via her deputy Adam P. Monreal Esq.

79.     Plaintiff here seeks *inter alia* a court order from this District Court directing the county to comply with the ADA. Through this lawsuit, she demands that Cook County afford individuals with disabilities an opportunity to participate in the county's court proceedings that is equal to that provided to nondisabled individuals.

80.     All citizens, including those with disabilities, should have an equal opportunity to observe (and, when they are parties, to participate) in the judicial proceedings in our land. Since the onset of the Covid-19 pandemic, virtually all state courts in our land have adopted the pattern and practice of allowing observation of and participation in court dates via Zoom video conferencing. Zoom has become the normative medium for conducting state judicial proceedings in fact. Even the state courts which are not Zoom-only are typically Zoom-enabled, in a so-called "hybrid" setup wherein all are welcomed to participate in person or via Zoom[8].

81.     Similarly, most of the federal courts utilize teleconferences for conducting the vast majority of court dates. Here in the Northern District of Illinois, teleconferences are normative. Gone are the days that the Dirksen Building was over-stuffed with attorneys, parties

---

[8] One great example is provided by the courtroom of (elected, not appointed) Circuit Judge Catherine A. Schneider from the Law Division of Cook County. Judge Schneider is well perceived as one of the most outstanding judges in Cook County in that she is an exemplary lifelong learner and student of the law, dedicated always to dispassionate application of the law and always with unflagging integrity. Judge Schneider welcomes all litigants in her courtroom to attend via Zoom or in person.

and observers. On a random weekday at the Dirksen Building, a typical courtroom of a District Judge would typically be attended by a courtroom deputy or two. Parties, attorneys and judges are very typically not physically present in the courtroom.

82. Therefore, disallowing the use of Zoom – especially when one of the parties has disabilities flatly preventing in-person court attendance – implicates material questions about compliance with Title II of the ADA.

83. The timing of Judges Fernandez and Ahern's capricious ban of Zoom attendance (as ratified by Judges Scannicchio her Chief Deputy Clerk Adam Monreal) also appears retaliatory in response to the August 2024 filing of the Bribery Lawsuit under which lawsuit Kenton Girard seeks relief *inter alia* for violations of his civil rights by Cook County Judges William S. Boyd and Renee G. Goldfarb and for RICO violations by opposing counsel Beermann LLP involving predicate acts of judicial bribery.

Defendants have repeatedly exploited Plaintiff's disabilities.

84. Effective on November 22 2024, when Kenton Girard filed a petition for substitution of judge for cause directed at Defendant Fernandez, the Custody Proceedings were stayed pursuant to the operation of 735 ILCS 5/2-1001(a)(3), under which Defendant Fernandez was judicially sidelined and the proceedings were paused in the absence of a judicial officer.

85. The proceedings were also stayed for a distinct second reason, namely that under Cook County rules, the proceedings were stayed when Plaintiff timely submitted her appeal of the determination of ADA Elena Demos to ADA Vincent D. Waller. Independent of the resolution of Kenton's petition to remove Judge Fernandez, the proceedings remain stayed until ADA Vincent D. Waller resolves Plaintiff's appeal as to her lack of ADA accommodations.

86. In the morning of December 20 2024, Defendant Karen Paige at the direction of

Enrico Mirabelli and with the blessing and approval of Judges Fernandez and Ahern noticed Plaintiff for a deposition to take place at 1:00 pm on that very day *in person* in Room 1905 of the Richard J. Daley Center.

87.     On December 17 2024, Attorney Karen Paige at the direction of Enrico Mirabelli and with the blessing and approval of Judges Fernandez and Ahern noticed Plaintiff's husband Kenton Girard for a deposition to take place at 4:00 pm also in Room 1905.

88.     On December 30 2024, Attorney Karen Paige at the direction of Enrico Mirabelli and with the blessing and approval of Judges Fernandez and Ahern propounded a motion to compel the depositions of Plaintiff and her husband Kenton Girard, in their typical pugilistic fashion seeking sanctions[9] for Plaintiff's failure to attend the deposition in person.

89.     On January 3 2025, Attorney Candace Meyers at the direction of Enrico Mirabelli penned an ex parte letter to Defendant Ahern – who has been hand-picked by Defendant Scannicchio  to preside over the Custody Proceedings in the wake of Judge Fernandez's recusal for cause – intentionally not copying third party defendants in that matter namely Detective Ryan McEnerney, Karen Paige and Vanessa Hammer.

90.     Such ex parte communication is strictly prohibited under Cook County Rule 17.1, and Defendant Ahern is further liable for failing to rebuke Attorney Candace Meyers on the record. Because Attorney Meyers has additionally failed to serve a written summary of the contents of her ex parte communication with Defendant Ahern on all parties within two (2) days of propounding her illicit missive, she stands further in breach of Cook County Rule 17.2(b).

---

[9] The so-called **Beermann Motion for Fees Playbook** is explored in detail under the amended complaint Dkt[73] under the Bribery Lawsuit in this District. By way of a high-level summary, Beermann LLP and its attorneys are well-known and well-practiced as to propounding excessive and improper motions for attorneys fees in virtually all family court proceedings in which they handle. Kenton Girard is seeking damages under the civil RICO statute, in which he exposes a pattern of predicate acts including *inter alia* violations of the Hobbs Act for the extortionate practices under which Beermann LLP seeks excessive and unreasonable attorneys fees as part of its established modus operandi in the Domestic Relations Division in Cook County.

91.     The ostentatious violations by Beermann LLP and its attorneys – all under the direction and supervision of Enrico Mirabelli – continue to mount. On January 3 2025, Attorney Elster of Beermann LLP penned an 18-page-long (not counting exhibits) opposition brief[10] to Kenton Girard's petition seeking Defendant Fernandez's removal. Under Ill. S. Ct. R. 182(a), Kenton Girard is now duly entitled to twenty-one (21) days to fashion a reply brief, thereby making his reply brief due on January 24 2025. For this reason, the hearing on Kenton Girard's petition to remove Defendant Fernandez cannot take place.

92.     As to the contents of that opposition brief, the highlight appears at p. 14: "All of Kenton's arguments about the court lacking jurisdiction after it uttered the phrase 'I will grant the motion' [sic] are simply without merit and detached from reality." Attorney Elster references the following exchange between Defendant Fernandez and Kenton Girard, as memorialized in the transcript of the hearing from October 18 2024 at pp. 4-5:

> **Mr. Girard:** Mr. Girard filed an SOJ as of right yesterday.
> **The Court:** You did?
> **Mr. Girard:** Yup.
> **The Court:** I did not see that. I'm sorry.
> **Mr. Girard:** I can deliver it to you right now if you'd like.
> **The Court:** Yeah. If you have the motion, I will take it. Okay.
> **The Court:** All right. **I grant your motion.**

93.     In reality, the briefs submitted by Kenton Girard in support of his petition to remove Defendant Fernandez take the position that Judge Fernandez was divested of her jurisdiction not at the moment of her grant of Plaintiff's petition for substitution of judge as of right, but rather two days earlier *when Plaintiff timely filed her petition with the clerk on October 16 2024*.

94.     Setting aside the finer legal point of whether Plaintiff's petition operated to

---

[10] Incidentally, under the Cook County Circuit Court Rules, briefs must abide by 15 page limits.

*Marissa Girard v. Rossana P. Fernandez et al.*

remove Defendant Fernandez upon filing or upon Defendant Fernandez's pronouncement in open court, Defendant Fernandez was unambiguously divested of jurisdiction in the Custody Proceedings no later than the moment of her grant of Plaintiff's petition seeking her removal in open court on October 18 2024.

95.     Furthermore, under application of judicial estoppel based upon her own open court ruling – and preempting the inevitable motions to dismiss – Defendant Fernandez cannot mount the argument that her jurisdiction over the Custody Proceedings was never in question. Defendants have demonstrated an open disregard for open access to courtrooms.

96.     Judges Fernandez and Ahern and courtroom coordinator Ebony Cheers ignored all subsequent written  communication and telephone calls made from Plaintiff complaining about the improper "striking" of her petition, which happened after Judge Fernandez divested herself of jurisdiction over the Custody Proceedings. Moreover, none of the involved staff from the Domestic Relations Division – including Judge Scannicchio, Adam Monreal, Jaime Barcas, Judge Ahern – responded in any way.

97.     Further email messages to Judge Scannicchio and Adam Monreal after her office set a hearing date for Kenton Girard's petition to remove Judge Fernandez were similarly unanswered. Adam P. Monreal Esq and Judge Ahern flatly ignored Plaintiff's queries during this time. In one instance, Judge Scannicchio's assistant Jaime Barcas responded with a condescending boilerplate email message containing instructions for pro se litigants.

98.     Furthermore, communications with Judge Fernandez's Court Coordinator Ebony Cheers were met with a scowl. Ms. Cheers on two separate occasions indicated that she personally saw no reason to allow Plaintiff to participate in court dates via Zoom. Furthermore, she indicated that there were strong countervailing reasons to not allow participation by Zoom

including (a) the proceedings were "contentious", and (b) Zoom participation raised serious safety concerns as to the parties. Ms. Cheers also indicated that neither Judge Fernandez nor Judge Ahern would allow Zoom access under any circumstances whatsoever.

99.     The September 5 2024 status conference before Judge Fernandez was not a closed proceeding, it was a general status call attended by numerous litigants and attorneys with different matters before the Court – none of which were closed to the public. Similarly, the October 18 2024 case management conference was neither a closed proceeding, it was also attended by numerous litigants and attorneys with different matters before the Court – none of which were closed to the public.

100.    Family court reform advocate Tina Swithin and investigative journalist were among the attendees of the September 5 2024 court date under the Custody Proceedings. Their purpose in attending was to obtain more first hand material and evidence to write about on their respective blogs and for the collective hundreds of thousands of followers consisting primarily in other victims of the family court system.

101.    On October 18 2024 when the SOJ as of Right matter was called, Judge Fernandez granted the same. Subsequently goaded by objections lodged in open court by Enrico Mirabelli, Judge Fernandez – who at that point had divested herself of jurisdiction – openly remarked "Marissa Girard is not here in person. So I am striking her motion. She knows she has to be here in person for all court dates." Those remarks were memorialized by a court reporter in attendance and reduced to a written transcript of the hearing.

102.    Judge Scannicchio and Adam Monreal, as well as ADA personnel Elena Demos and Vincent D. Waller, collectively failed to ensure that Domestic Relations Judge Fernandez's

courtroom was accessible to Plaintiff because *inter alia* Plaintiff was actively refused egress to the proceedings from the court's Zoom waiting room during the October 18 2024 proceeding.

103.   Plaintiff has been injured as a result of the Defendants' conduct and has sustained humiliation and emotional distress. None of Judges Fernandez, Scannicchio, Ahern or domestic relations staff Adam Monreal and Ebony Cheers enjoy either judicial nor qualified immunity because the decision to deprive Plaintiff of her constitutionally protected right was an *administrative action* and not subject to judicial immunity and the right to attend public judicial proceedings is a *well-established right* and its violation is not protected by qualified immunity.

The Defendants have concocted a counterfactual narrative.

104.   The denial letter of November 1 2024 from CDC Demos states that Plaintiff participated or observed via Zoom during the September 5 2024 court date under the Custody Proceedings. Such participation did not take place and is controverted by Zoom logs. The denial letter's further claim that cameras were being disruptively turned on and off is refuted by thirty or more witnesses who observed the proceedings under the September 5 2024 court date.

105.   Furthermore, the notion that there was a concern that participants were recording the court date via Zoom is unsubstantiated. Moreover, that would appear to be a generic concern for all of the millions of court proceedings which take place throughout the state courts in our country every month.

106.   Finally, the actions of third-party court observers (including family court reform advocate Tina Swithin, who was present during the court date) cannot be construed as a legal foundation to permit or deny Zoom accommodations for Plaintiff. To wit, under the ADA reasonable accommodations must be based on the individual's specific disability, the feasibility of the requested accommodation and the fundamental requirements of the proceeding.

107.    As discussed, CDC cited alleged "serious safety concerns" attendant to the parties participating in court dates via Zoom. How virtual participation could lead to concerns about physical well-being has not been explained. Nor could it be explained, because it is a purely fictitious narrative.

108.    The court's threat to have Sheriff's Deputies present appears to be nothing more than an intimidation tactic, because there is no underlying safety concern other than one which might be manufactured by forcing in-person court dates under the pressure of the high-conflict Custody Proceedings. This threatening approach not only fundamentally misapprehends Plaintiff's medical and palliative needs, but appears to be calculated as a form of retaliation against Plaintiff for exercising her legal right to demand accommodation under the ADA.

109.    The no-Zoom order of Judge Fernandez constitutes a deliberate disregard for Plaintiff's safety and well-being from another perspective also. In late May 2024, Plaintiff obtained an emergency Stalking No Contact Order ("SNCO") against Jane F. Girard. By forcing Plaintiff to be physically present – feet away from – Jane F. Girard, is subjecting Plaintiff to physical danger.

110.    Finally, the characterization of the proceeding as "contentious" is unreasonable. At no point during the nearly three year history of the Custody Proceedings were there any incidents whatsoever of raised voices, disruptive behavior, threats or lack of respect for the court. More to the point, there has been judicial finding or sanction handed down by any of the eight separate judicial officers who have presided over the Custody Proceedings.

111.    Plaintiff has consistently provided comprehensive medical documentation underlying the need for Zoom attendance. Her attempts to share a confidential letter from her physician, under seal, have been furthermore denied. Again counterfactually, CDC Demos only

asked for specifics as to Plaintiff's disabilities specifically after the conclusion of the October 18 2024 Case Management Conference. Moreover the Cook County Court has disregarded its requirements to engage in good faith dealing regarding needed accommodations.

Defendants have ostentatiously and vexatiously refused to accommodate Plaintiff.

112.    Plaintiff has been fighting for express permission from Judges Fernandez, Scannicchio and Ahern to allow her to attend court remotely via Zoom. The persistent denial of these numerous requests appears to be based on several factual inaccuracies, demonstrates apparent retaliation for protected legal actions, and has been compounded by subsequent procedural violations that further discriminate against Plaintiff based on her disabilities.

113.    It is noteworthy that prior to these recent denials under the installation of Judges Fernandez and Ahern over the Custody Proceedings, all of Plaintiff's previous requests for Zoom access had been granted without issue. Every single prior court date has been successfully conducted over Zoom, with no problems or incidents. Significantly, no judge who has presided over these proceedings has ever (a) expressed any concern about Plaintiff's participation via Zoom, (b) characterized the Custody Proceedings as contentious, (c ) raised any safety concerns connected with attendance of court dates via Zoom, or (d) questioned the appropriateness of allowing Plaintiff to participate in court dates via Zoom.

114.    This established history includes (a) successfully granted ADA accommodations, (b) effective remote court participation, (c) proper conduct during all previous Zoom proceedings,  (d) consistent accommodation of Plaintiff's disabilities.

115.    Seven previous judges accepted and facilitated remote participation via Zoom without incident during the history of the Custody Proceedings. This makes the current spate of denials under Judges Fernandez and Ahern particularly puzzling and suggests the lack of any

legitimate underlying evidentiary foundation. The abrupt reversal of these previously granted accommodations, which had effectively served their purpose throughout our proceedings, strongly suggests that this denial is motivated by factors unrelated to the merit of the accommodation request or any legitimate court concerns.

116.    Remote court attendance via Zoom has been successfully used previously in the Custody Proceedings, is widely implemented throughout the state courts in our land, creates no undue burden on the court and does not fundamentally alter court proceedings. Moreover Zoom decreases operating costs for the courts which employ it. Fewer bodies in the courtroom necessitates fewer courtroom deputies, security personnel and other court administrators.

117.    The about-face reversal by Judges Fernandez and Ahern as to Zoom participation implicates their impartiality as judicial officers, creates substantial concerns about their respect for the force and effect of federal law and the Constitution, creates questions about their motives and potential retaliatory animus and suggests a lack of consistency in own decision-making.

A self-reinforcing cycle of harm has resulted.

118.    The denial of this accommodation, combined with threats made against Plaintiff by Judges Fernandez and Ahern and the apparent retaliation for filing a federal lawsuit, has exacerbated Plaintiff's medical condition. This creates a cycle wherein the denial of accommodation worsens Plaintiff's condition consisting of the following adverse impacts:

a. The worsening of Plaintiff's condition amplifies her need for ADA accommodation.
b. The threats and hostility further impact Plaintiff's health.
c. The retaliatory nature of these actions causes additional stress and anxiety.
d. The retaliatory timing roadblocks Plaintiff's constitutional right to seek a remedy.
e. Forcing in-person attendance triggers PTSD[11] symptoms.
f. These PTSD symptoms directly worsen Plaintiff's medical conditions.

---

[11] The EEOC regulations specifically identify conditions that should easily be concluded to be disabilities. Such listing includes PTSD.

*Marissa Girard v. Rossana P. Fernandez et al.*

119.    The Defendants' gross mishandling of these connected conditions demonstrates their failure to understand or properly accommodate disability needs. The compounding effect of these violations includes (a) creation of an inaccurate court record suggesting "non-appearances" when legally proper notices and motions were filed, (b) prejudicial treatment of properly filed legal motions based on disability status, and (c) additional psychological stress from having rights violated while being physically unable to attend and defend against improper procedures.

120.    Investigative Journalist Michael Volpe captured this dynamic in his column on substack in after observing the September 5 2024 court date under the Custody Proceedings:

> The action began when Tina Swithin, from One Mom's Battle, logged on. She told me she was about fifteen minutes late, but Judge Fernandez quickly took notice. Tina told me that she routinely court watches, and her general protocol is to turn her microphone and video off, because having them [on] can cause a distraction. Judge Fernandez saw it differently. She quickly demanded her video on, and for Tina to identify herself. Tina turned her video on and wrote that she was an observer for the Girard case. "As soon as she saw that, she was fuming," Tina told me. "She basically accused us of harassing the court." Tina called Fernandez "unhinged.

The dialogue with CDC Elena Demos JD goes nowhere.

121.    On September 12 2024, Plaintiff emailed Defendant Demos advising her that due to her disability, she would be unable to attend the in person Case Management Conference ordered by Judges Fernandez and Ahern and set for October 18 2024. In this email, Plaintiff specifically requested the right to participate in the upcoming court date via Zoom, in keeping with the manner in which she was previously allowed to participate in the Custody Proceeding before the half dozen other judges who preceded the appointment of Judges Fernandez and Ahern thereunder.

122.    Receiving no response whatsoever from Defendant Demos, Plaintiff emailed Defendant Demos again on September 23 2024 requesting an update on her request to participate in the court date via Zoom. Defendant Demos responded the following day, reporting that Judges

Fernandez and Ahern had not yet weighed in on the matter.

123.    Another week went by without any further response from Defendant Demos, and Plaintiff again requested an update from her, wherein Defendant Demos finally got back to her after the elapse of another week on October 4 2024, stating:

> Ms. Girard,
> I have communicated your accommodation request to the judge.  There are a number of important reasons why the judge has scheduled these court dates in-person.  If you are unable to attend in-person on October 18, 2024, you can file a motion that the case be heard on a different date where you will be able to attend in-person.
> Thank you. Elena Demos, J.D.

Ironically, under the "take two" reasoning of Judges Fernandez and Ahern on October 18 2024, no motion will be allowed by Plaintiff unless presented in person – thereby excluding her totally from the courtroom.

124.    Plaintiff did not take long to craft her reply on the very same day, writing:

> Dear Ms. Demos,
> Thank you for your response. However, I must express my deep disappointment and concern regarding the handling of my accommodation requests over the past year.
>
> As the ADA Coordinator, I expected your office to facilitate reasonable accommodations for my disability, as required by law. Instead, I've encountered repeated barriers and delays. The suggestion to file a motion for a different in-person date does not address my need for a remote attendance option due to my medical condition.
>
> I would like to remind you that the Americans with Disabilities Act requires courts to provide reasonable accommodations to ensure equal access to justice. Remote attendance is a common and reasonable accommodation, especially given current technological capabilities.
>
> Your response appears to prioritize the court's preference for in-person hearings over my legally protected right to accessible proceedings. This approach seems to contradict the spirit and letter of the ADA.
>
> I formally request:
>
> 1.  A detailed explanation of why remote attendance cannot be accommodated.
> 2.  Information on how to file a complaint regarding the continued failure to provide reasonable accommodations.
> 3.  A solution that respects both the court's needs and my rights under the ADA.

I hope we can resolve this issue promptly and ensure that the court fulfills its obligations under disability law.

125.    Again waiting a full week to respond, on October 10 2024 Defendant Demos wrote to Plaintiff indicating that after consulting Judge Fernandez, Plaintiff's participation by Zoom was out of the question because "[t]he court proceeding is being held in person because Zoom attendance was very chaotic, and the court is considering the safety of the parties. There will be Sheriff's Deputies present in court."

126.    Indeed, after the stunning refusal by Judge Fernandez (and duly ratified by Judge Ahern) conveyed by Ms. Demos on October 10 2024, that very same day Plaintiff reached out to Judge Fernandez's court coordinator, Defendant Ebony Cheers. At all times in question, Ebony Cheers served as the courtroom coordinator for Judges Fernandez and Ahern since her installation in her courtroom at the Daley Center, which took place on or around Summer 2024 after a stint on the bench in Rolling Meadows.

127.    In this capacity, Defendant Cheers also had an obligation to ensure that appropriate measures were taken to reasonably accommodate Plaintiff in light of her documented mental and physical disabilities. However, Plaintiff's request for reconsideration of her accommodation by Defendant Cheers was flatly denied. Whereas Ms. Demos deferred to Judge Fernandez as the final say on whether Plaintiff would be allowed to participate in court dates via Zoom, Defendant Cheers flatly denied Plaintiff's request stating plainly that "she was in charge of courtroom matters for Calendar 99" and she did not see any reason to grant Zoom access.

128.    The "chaos" referenced by Ms. Demos was presumably a reference to the prior court date of September 5 2024 (indeed previous to the October 18 2024 Case Management Conference, the only court date presided by Defendant Fernandez in the Custody Proceeding was on September 5 2024). How participation by Zoom could imply a threat to the safety of the

parties is certainly difficult to comprehend. But the remedy of ordering those very same parties who caused "chaos" via their remote attendance – **to such a degree that their physical safety was threatened** – to appear in person is absolutely nonsensical. One can only reasonably interpret the imposition of in-person attendance as a form of punishment, and the promised attendance by Sheriff's Deputies minimally an admonition or more likely outright intimidation.

129.    Allowing the October 18 2024 court date to pass before replying via email again to Plaintiff, Ms. Demos appeared to backpedal stating that Judges Fernandez and Ahern had not yet decided on whether to allow Plaintiff to participate in the remaining court dates in the Custody Proceeding via Zoom. In the same email, Defendant Demos asked Plaintiff to explain the nature of her disability preventing her from attending court in person.

130.    Plaintiff responded on the very same day that she had been diagnosed by her physician with interstitial cystitis as well as PTSD (post-traumatic stress disorder), and as a result of her medical conditions she suffers from chronic and debilitating pain as well as a constant need to urinate. Additionally, Plaintiff noted that she has to manage severe side effects from the pain medication which impair her motor skills.

131.    Making matters worse, Plaintiff's condition is exacerbated by stress and, under stressful situations (such as her physical presentment in court, under the high-conflict Custody Proceedings), she is at great risk for the onset of debilitating anxiety attacks, locomotive degradation and aphasia. The unnecessary stress caused by Judges Fernandez and Ahern's refusal to allow Plaintiff to participate by Zoom was likely exacerbating her medical conditions.

132.    Plaintiff sent a follow-up email message to Defendant Demos on October 21 2024, addressing their shocking disregardment of her disability:

> I am following up on this email. My health has been severely affected by the stress of what happened Friday and the previous week, including you not communicating ANYTHING to me before the court date despite my giving you and the Judge over a MONTHS notice that I was not

available and undergoing treatment due to my disability. I also made every effort to be given the opportunity to be present over Zoom which was not granted to me, with no explanation given.

The gall of the Judge to go ahead with this hearing and then to call out my name in court, knowing FULL WELL that I would not be there due to my disability was further confirmation that she knew exactly what she was doing and was trampling over my rights - is beyond wrong and illegal. She then ignored my Substitution of Judge For Right with NO LEGAL BASIS AT ALL, as the SOJ does not require a party to be present to serve this. I filed a proper written application and it was served properly and Judge Fernandez knowingly ignored my rights with your blessing.

Defendants Demos, as well as Judges Fernandez and Ahern, remained silent in response.

133.    Plaintiff again wrote to Ms. Demos on October 28 2024:

Additionally, I am extremely concerned about the threats made by Judge Fernandez, who had Deputy Sheriffs present in an apparent attempt to intimidate me. This would have caused me even greater extreme emotional distress had I been able to attend in person and has contributed to my fear of appearing in person for any future date regardless of my health status.

I am shocked and disappointed that as the ADA coordinator, the accommodations I require are instead being minimized, mocked, and threatened. This is unacceptable and a clear violation of my rights under the Americans with Disabilities Act.

Again Defendant Demos refused to respond to Plaintiff, in an obvious affront to proper procedures under requesting of reasonable accommodations under the ADA.

134.    Additional follow-up telephone calls to Defendant Ebony Cheers and the clerks for Judges Fernandez and Ahern also proved futile. Ms. Cheers again reiterated that she saw "no good reason to allow [Plaintiff] to use Zoom", and she further noted that Judge Fernandez "**does not appreciate court watchers**", so everything would be in person from that point forward.

135.    On November 1, 2024, Defendant Demos sent a written response to Plaintiff regarding the court's refusal to allow Plaintiff to attend court via Zoom, stating in relevant part:

[T]he judge had prohibited litigants in the case from attending court hearings via Zoom due to the highly contentious nature of the proceedings, the fact that the parties would turn their Zoom cameras off and on, would address each other instead of the court, and would generally not comport with the proceedings of the court. There was also a concern that it was unable to be ascertained whether any of the parties were recording the court proceedings. As a result of the contentious nature of the proceedings, all parties were ordered to appear in person and Sheriff's

Deputies were secured for each court appearance to maintain order.

136.    Of course, any dispute in court is inherently adversarial. Hereunder, the proceedings for over two years have consisted primarily in court dates conducted over Zoom. As to the position adopted by Judges Fernandez and Ahern, multiple eyewitness accounts during the first hearing with Fernandez plainly contradict her story of the first hearing she presided over.

137.    Also in her written response to Plaintiff, Ms. Demos states "Decisions on ADA accommodation requests are made by the judge in the case. The OCJ ("Office of Chief Judge") CDC ("Court Disability Coordinator", i.e. Elena Demos) acts solely as a liaison between the individual making an ADA accommodation request and the judge in the case." This statement makes it very clear that Judge Fernandez has personally made the statements contained in this response. Her statements are a clear distortion and misrepresentation of the facts.

138.    The "safety of the parties" requiring in-person attendance of all Court Dates (at which Sheriff's Deputies would be present in appropriate numbers) cannot possibly be understood as a conclusion built on rational assessment of circumstances. Because there is evidently no logical reasoning which underlies this conclusion. Instead, the capricious revocation of attendance of court dates via Zoom is a barely disguised means of harassment and intimidation targeting the Plaintiff, and further calculated to distress her husband Kenton Girard who is also party to the Custody Proceedings.

139.    According to the November 1 2024 letter from Defendant Demos, furthermore, Plaintiff needs to propound her request for Zoom accommodation again. However, such request at this time appears to be mooted by the fact that Judge Fernandez has suddenly and inexplicably allowed Zoom participation as to court dates to once again resume, per the standards which have been well-ingrained since the onset of the Covid-19 pandemic across all state courts in our land.

Domestic Relations Presiding Judge Scannicchio's office ignores the issue.

140.    In early December 2024, Plaintiff made numerous efforts at outreach to Presiding Judge Scannicchio's office via Executive Assistant Jaime A. Barcas, to no avail. On two instances, Mr. Barcas replied with condescending canned responses including resources for pro se litigants.

141.    In another instance Judge Scannicchio's assistant Jaime Barcas indicated that the Office of Presiding Judge Scannichio had no involvement with accommodations for persons with disabilities, but failed to identify the proper channels for requesting the same.

142.    On December 12 2024, Plaintiff emailed Chief Deputy Clerk Adam P. Monreal Esq sought his intervention to clarify that she would be able to participate via Zoom in all future court dates under the Custody Proceedings. Similar to her outreach to Jaime A. Barcas, Mr. Monreal has flatly ignored Plaintiff's questions and entreaties in their entirety.

Vincent D. Waller JD handles the ADA appeal.

143.    On November 11 2024, Plaintiff filed an appeal of the November 1 2024 disposition by CDC Demos as to her request for ADA accommodation consisting in the ability to attend all court dates via Zoom.

144.    This appeal utilized a review process instituted and approved by the Supreme Court of Illinois, wherein a different Court Disabilities Coordinator ("CDC") would be responsible for reviewing the decision of CDC Demos. In this particular instance, the reviewing CDC assigned to Plaintiff's appeal was Vincent D. Waller JD[12].

145.    Extensive back-and-forth emails between Plaintiff and Mr. Waller ensued. On

---

[12] While the Cook County appeal form utilized for her appeal of the ADA accommodation denial by CDC Demos lists Vincent Waller as occupying the role of another CDC in the Cook County Court, his email signature lists his official position as "Human Resources Assistant Administrator, Office of the Chief Judge, Circuit Court of Cook County".

November 25 2024, Mr. Waller indicated that he had hoped to construct a response to her appeal that week. Mr. Waller asked for evidence of previous accommodations which had been accorded to Plaintiff, and she duly noted that she had been excused from jury duty and that prior to October 18 2024, she had been permitted to participate via Zoom at virtually all court dates.

146.    In another matter before Hon. Michael Weaver, Plaintiff was also allowed to participate via Zoom. Among other points, Plaintiff noted that she suffers from interstitial cystitis, a debilitating condition that can render her unable to leave home, particularly when exacerbated by stress. Having her medical condition discussed in court without her presence has been both traumatic and humiliating, and as noted in her appeal, her PTSD from this ongoing case further aggravates my physical symptoms.

147.    On December 12 2024, Mr. Waller inquired about the timeline for when Plaintiff's course of medical treatment would be completed. She responded that treatment will continue for the foreseeable future.This response was particularly enervating because Judges Fernandez and Ahern had the previous week ostensibly re-allowed attendance of all court dates via Zoom. However ambiguity remained because there was no court order allowing the same.

148.    Because Plaintiff's appeal of the ADA accommodations denial by CDC Demos was filed within fifteen (15) days of the date of the denial, it timely operates to cause a stay of the Custody Proceedings in all respects.

149.    Additionally, Plaintiff has moved for a stay of the Custody Proceedings in all respect until the adjudication of the appeal of the denial of her ADA accommodation has been completed, presumably by Vincent D. Waller. For that reason, the Custody Proceedings are currently in a kind of "Twilight Zone".

<u>Plaintiff petitions to remove Judge Fernandez.</u>

150.    On October 16 2024, Plaintiff filed a petition for substitution of judge ("SOJ") as of right under the authority of 735 ILCS 5/2-1001(a)(2), her first such petition in the family law proceeding hereunder. Because her application was timely presented before the evidentiary hearing and before Judge Fernandez had ruled on any substantial issue in the case in the family law proceeding, that application operated to remove Judge Fernandez from the proceedings[13].

151.    As a consequence, the proceeding presided by Judge Fernandez on October 18 2024 was in effect *ultra vires*. The decisions and actions by Judge Fernandez at the October 18 2024 court date constituted nothing more than "playing judge" and therefore do implicate legal or judicial orders.

152.    Defendant Fernandez moreover does not enjoy judicial immunity post October 16 2024. Under a strict reading of the substitution of judge statutory language, it is indeed unnecessary for a judicial officer to "ratify" or indeed to expend any discretion whatsoever as to a properly presented application. The paper filed by Plaintiff hereunder represented her first request for SOJ and was accepted by the clerk, and it did not implicate timeliness concerns.

153.    At best, a judicial officer targeted by a petition for SOJ as of right may perform the nominal and administrative task of confirming the effect of the petition with a docket entry. As a result, prongs (2) and (3) of *Dawson v. Newman*, 419 F. 3d 661 (7th Cir. 2005) both fail: under no colorable circumstances was Judge Fernandez to take any action other than possibly ratifying the force and effect of the SOJ petition brought against her. Litigants from throughout our state and through the decades have come to expect that granting of their first timely SOJ petition as of right is a formality at most.

---

[13] In the court date on October 18 2024, upon receipt of Plaintiff's Petition for SOJ as of Right, Judge Fernandez first states "So, I'm going to grant your motion". Then Mr. Mirabelli in opposition to the paper suggests that Plaintiff must be present to argue the motion, and Judge Fernandez thereby ruled – after she had divested herself of jurisdiction – that she was striking the SOJ as of Right.

*Marissa Girard v. Rossana P. Fernandez et al.*

154.    As a result, all actions, orders and directives of Judge Fernandez signed or propounded after the filing of Plaintiff's petition for SOJ on October 16 2024 are void ab initio. The current status is that every single decision, order and action taken by Judge Fernandez after approving Plaintiff's petition for SOJ as of right as the first order of business before the court on October 18 2024 – including denying pending motions for a stay and for intervention, and setting an omnibus scheduling order leading up to the ultimate evidentiary hearing – was without jurisdiction and must be wholly undone.

155.    The events of the September 5 2024 court date were shameful to behold and raise significant questions about the judicial temperament and bias of Judge Fernandez. On September 5 2024, Judge Fernandez held her first hearing hereunder. The current custody modification proceeding has been active for over two (2) years and none of the previous judicial officers (including without limitation J. William S. Boyd and J. Renee G. Goldfarb) had any issues holding Zoom hearings in this case.

156.    During this hearing, Judge Fernandez did not allow Petitioner to speak other than when she asked him to supply truncated single word responses to questions posed (whereas opposing counsel was allowed to speak at length). She also entered a facially questionable decision that all future court dates should be in person not over Zoom, thereby (and perhaps intentionally) complicating attendance for Plaintiff who requires participation via Zoom.

157.    One of the court watchers in the September 5 2024 court date was Tina Swithin (@onemomsbattle) who made the following Instagram post highlighting what happened during this hearing. Tina stated:

> Never have I ever – this morning, I logged on to watch a public hearing in the case of @justiceforgwenandgrace. I invited a group of students who have an interest in family court advocacy and reform. I have been attending court watches for years as an advocate – both in person and online. Never have I ever seen a judge completely unhinged and visibly ANGRY that

there were court watchers. Typically, it is courtesy to have cameras and microphones off, which is what I did and what I instructed the students to do. She threatened to take people out of the zoom call if cameras weren't turned on immediately, so we all complied. Then she said names needed to reflect the case you were present for: I immediately changed my name to "Tina Swithin: Observer of Girard case.'" As soon as she saw that, she was fuming and accused us of harassing the court for being present AT A PUBLIC HEARING. She then threatened to order that future court dates for this case be in-person only. Show me a judge wanting to keep things out of the public eye and I will show you a red flag.

Show me a judge that has a problem with court observers and I will show you a red flag. Court watching is the practice of observing courtroom proceedings to ensure transparency, accountability, and fairness…As described by the American Bar Association: The right of public access to court proceedings is enshrined in the Constitution. The First Amendment to the Constitution gives the public and press a right of access to court proceedings. Requiring the work of the courts to be conducted in public view provides an important check on the potential for abuse of power, allowing observers to better understand how the justice system operates and enhancing public confidence in the courts.

Following that hearing investigative journalist Michael Volpe published an article raising serious questions about Judge Fernandez's temperament, wherein he includes material from his own interview with Tina Swithin.

<u>The judicial authority of judges Fernandez and Ahern has been degraded.</u>

158. Plaintiff has been blindsided by an additional round of trauma because of Judges Fernandez and Ahern's obvious gamesmanship which has been calculated to maximize emotional distress for Plaintiff. To wit, the recent December 3 2024 court date (for presentment of a nominal motion by Beermann LLP) was affirmatively allowed over Zoom, when this Court made an extremely heated pronouncement just weeks earlier that all court dates would be in person.

159. Indeed, ADA compliance personnel have reduced Judges Fernandez and Ahern's command to writing in their correspondence with Plaintiff. The arbitrary nature of these decisions regarding in-person versus remote attendance, particularly when they resulted in the

improper denial of Plaintiff's statutory right to one (1) substitution of judge upon timely application, has caused Plaintiff significant additional mental anguish and emotional distress.

160.    Given her pre-existing mental impairment, documented by years of treatment by her physician, this is no trivial matter. The judiciary in our land first and foremost must honor our sacred Constitution; the ways in which Judge Fernandez has abused her power to inflict extremely serious harm upon the rights of Plaintiff and court watchers is shocking to behold.

161.    The October 18 2024 court date was not a closed proceeding; it was attended by numerous litigants and attorneys with different matters before the Court none of which were closed to the public. However, Plaintiff was attempting to join via the Court's Zoom credentials and was actively turned away by Judges Fernandez and Ahern and Ebony Cheers.

162.    Indeed, Plaintiff had important business before the Court, namely her first petition under these proceedings to effectuate a Substitution of Judge as of Right. However, she was never admitted access to the Court's Zoom session. Plaintiff has sustained humiliation and emotional distress as a result of Judge Fernandez's vexatious refusal to allow Plaintiff to participate in the proceeding via Zoom.

163.    Absent action protecting the rights of free access to courtrooms for the public, the Cook County family court's credibility has been further tarnished by the actions of Judges Fernandez and Ahern. The right to attend public judicial proceedings is a well-established right,

164.    Moreover, Judges Fernandez and Ahern do not enjoy judicial immunity because the decision to deprive Plaintiff of her constitutionally protected rights by denying her access to the proceedings via Zoom was an administrative action. This egregious and hostile denial of access to the proceedings on October 18 2024 was an impermissible violation of Plaintiff's First Amendment rights.

165.    Judge Fernandez expressed her discontent with the presence of court watchers at the court date on September 5 2024. Questioning of some of the court watchers in attendance has revealed Judge Fernandez directed her courtroom staff to disable certain of the court watchers' Zoom access to the proceedings during that court date.

166.    Certain of those attendees (including family court reform advocate Tina Swithin) were there in an expression of solidarity with the minor children whose lives are at issue in the Custody Proceedings. Judge Fernandez's grotesque disregardment of the First Amendment rights of these civic-minded court watchers is a grotesque affair from every point of view.

### COUNT I - VIOLATION OF FIRST AMENDMENT
*42 U.S.C. § 1983*; *Fernandez, Scannicchio, Ahern*

167.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

168.    Defendants, acting under color of state law, deprived Plaintiff of her rights under the First Amendment to the United States Constitution by denying her admission to a public court proceeding on October 18 2024.

169.    Defendants' refusal to admit Plaintiff to the October 18 2024 proceedings violated a well-established First Amendment right, the right to attend public court proceedings, and therefore Defendants are not entitled to qualified immunity.

170.    Defendants' refusal to admit Plaintiff to the October 18 2024 proceeding is not subject to judicial immunity because, inter alia, it was an administrative determination and not part of any judicial proceeding.

### COUNT II - VIOLATION OF RIGHT TO IMPARTIAL PROCEEDINGS
*42 U.S.C. § 1983*; *Fernandez, Scannicchio, Ahern*

171.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

172.    By accepting bribes to render specifically requested favorable decisions to Beermann LLP clients, Defendants Scannicchio and Ahern cannot claim judicial immunity here.

173.    In 1927, the Supreme Court addressed a claimed violation of the right to an impartial judge. *Tumey v. Ohio*, 273 U.S. 510 (1927) involved a challenge to a conviction in a municipal court in which the mayor presided as the judge, for violation of the state's prohibition law, which resulted in a fine, a fraction of which was allocated to the mayor "in addition to his regular salary." *Tumey*, 273 U.S. at 518–19. The Court held that this improper financial motive violated the defendant's right to an impartial judge.

174.    With Defendants Scannicchio and Ahern both on the payroll of Beermann LLP, the proceedings are not impartial. Wherein Defendant Fernandez has propounded numerous orders and rulings *in the period since she divested herself of jurisdiction over the Custody Proceedings on October 18 2024*, the proceedings under her are neither impartial.

175.    Plaintiff has suffered injuries, damages and losses as a result of the violation of and interference with Plaintiff's constitutionally protected right to an impartial judge including numerous adverse decisions which would not have been rendered by a fair, impartial judge.

### COUNT III - VIOLATION OF TITLE II of ADA
*All Defendants* (only where required: under *42 U.S.C. § 1983*)

176.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

177.    Plaintiff is a member of a protected class under the ADA, due to Plaintiff's disabilities which are specifically recognized under the ADAAA of 2008.

178.    The ADA Title II prohibits disability discrimination by all public entities at the local level, e.g., school district, municipal, city, or county, and at state level.

179.    Under 42 U.S.C. § 12132, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

180. Defendants' conduct toward Plaintiff illustrated a willful and/or reckless violation of the ADA as well as a willful and reckless disregard of Plaintiff's protected rights in violation of implementing regulation 28 C.F.R. Part 35. Plaintiff's repeated and consistent requests for Zoom access to the legal proceedings were not an undue burden on Defendants, yet Defendants intentionally refused to accommodate Plaintiff's disabilities.

181. As a direct and proximate result of the discrimination described above, Plaintiff has suffered and continues to suffer loss of earnings, loss of income, mental anguish, distress, physical and debilitating symptoms of PTSD and interstitial cystitis, humiliation, and loss of enjoyment of life.

### COUNT IV - VIOLATION OF THE REHABILITATION ACT OF 1973
*All Defendants* (only where required: under *42 U.S.C. § 1983*)

182. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

183. The Rehabilitation Act of 1973 and its implementing regulations require that no qualified individual, solely by reason of her actual or perceived disability, be subjected to discrimination under any program or activity receiving Federal financial assistance. 41 C.F.R. § 60-741.2(o)(1); 45 C.F.R. § 84.3(j)(2)(i).

184. The Domestic Relations Division of the Cook County Courts receives federal grant funds to assist access to the courts by all persons. Defendants' inexplicable and cruel denial of Zoom access to Plaintiff places them in the crosshairs of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulation for recipients of federal funding.

### COUNT V - NEGLIGENCE
*All Defendants* (only where required: under *42 U.S.C. § 1983*)

185. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

186.     All of the Defendants hereunder owed a duty of care to Plaintiffs, including a duty to make accommodations and to provide courtroom access for Plaintiff owing to her disabilities in keeping with the requirements under Title II of The Americans with Disabilities Act of 1990.

187.     However, those duties were breached wherein the Defendants intentionally refused to accommodate Plaintiff with the ability to participate in court dates via Zoom.

188.     Those duties were further breached wherein additional staff from Domestic Relations including Judges Scannicchio and Ahern and clerk Adam P. Monreal Esq, despite full knowledge of the fight over ADA accommodations as to Plaintiff, and the violations of Plaintiff's First Amendment Rights on October 18 2024, stayed on the sidelines of the Custody Proceedings and refused to restore Plaintiff's access to the courtroom proceedings.

189.     As a result of these breaches of duties, Plaintiff has been harmed: (a) she has been denied access to the court dates in the Custody Proceedings, (b) she has experienced severe emotional distress and mental anguish and physical worsening of her symptoms under PTSD and interstitial cystitis, (c) her therapy and counseling business has suffered a setback measured in lost revenues and clientele, and (d) she has suffered the indignity of these violations.

## COUNT VI - DECLARATORY RELIEF
*All Defendants*

190.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

191.     An actual controversy has arisen and now exists between the parties in that Plaintiff contends, and is informed and believes that Defendants denies, that its courtroom access policies deny the full and equal access to the services and facilities of its court system, which Defendants operate and controls, fails to comply with applicable laws including, but not limited to, Title II of the Americans with Disabilities Act.

192.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

## COUNT VII - INJUNCTIVE RELIEF
*All Defendants*

193.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

194.    Plaintiff seeks injunctive relief calculated to cease the equal protection violations and other civil rights violations it is and has been committing against Plaintiff, and to establish and disseminate policies and procedures that ensure that ADA accommodations are not weaponized again.

195.    These policies and procedures should include: 1) training members of the Domestic Relations Division staff to properly field requests from persons with disabilities; 2) proper screening for actionable disabilities; 3) contours of reasonable accommodations; 4) preserving investigation evidence; and 5) publishing requests for ADA accommodations in order to enhance visibility and accountability to the public.

WHEREFORE, Plaintiff prays this Court grant the following relief:

1) Compensatory damages in an amount to be determined at trial;
2) Attorneys fees and costs under 42 U.S.C. § 1988 and under 29 U.S.C. § 794a(b);
3) Nominal damages for violations of constitutionally protected rights;
4) Such other relief that this Court may deem just, equitable and proper;

Dated: January 06 2025                Respectfully Submitted,

Marissa Girard, *In Pro Se*
/s/ Marissa Girard
965 Forestway Drive
Glencoe, IL 60022
Email: marissadakis@gmail.com
Tel: 773-425-4393